# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |
|---|---|
| HARVEY JACKSON Derivatively on Behalf of AXOGEN, INC., <br>          Plaintiff, <br> v. <br> KAREN ZADEREJ, PETER J. MARIANI, GREGORY G. FREITAG, JAMIE M. GROOMS, ROBERT J. RUDELIUS, MARK GOLD, GUIDO NEELS, AMY WENDELL, QUENTIN S. BLACKFORD and ALAN M. LEVINE <br>          Defendants, <br> -and- <br> AXOGEN, INC., a Minnesota corporation, <br>          Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Harvey Jackson ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant AxoGen, Inc. ("AxoGen" or the "Company") against the members of its board of directors (the "Board") and a member of upper management. The wrongdoing alleged herein has

caused substantial damage to AxoGen's reputation, goodwill, and standing in the business community, and has also exposed AxoGen to substantial, potential liability for violations of federal securities law.

2.      AxoGen provides surgical intervention for physical damage for peripheral nerve impairments. Some of the surgeries it provides include nerve allografts and extracellular matrices. AxoGen, however, claimed that the size of its market was massive when in fact it was not.

3.      Premised on the purported existence of a massive market, the Company's officers and directors conducted two public offerings of common stock just six months apart during the relevant time period raising proceeds of more than $170 million.  The offering documents filed with SEC to effectuate the sales, however, were riddled with falsities and misrepresentations. Indeed, these solicitation materials concerning the breadth of the Company's market were based on false interpretations and erroneous applications of scientific literature, including the Company's *own* marketing material disguised as legitimate scientific research conducted by objective third parties.

4.      Specifically, on November 16, 2017, AxoGen filed a Form 424B5 with the SEC for the sale of 805,000 shares of common stock at $21.00 per share. In return, AxoGen received net profits of approximately $15.4 million. The proceeds from the November offering were said to be used for general corporate purposes.

5.      On May 7, 2018, the Company filed a Form 424B5 with the SEC. In the May offering, the Company sold 3,450,000 shares of common stock at a price of $41.00 for each share. The Company received net profits of $132.46 million from the May offering. The proceeds from the May offering were said to be used for long term facilities and expansion and general corporate purposes.

6.    On December 18, 2018, *Seligman Investments* issued a report detailing how former AxoGen employees witnessed channel stuffing, revenue backlogging, the overstatement of active accounts, and that AxoGen's "growth [i]s driven by unsustainable, aggressive price increases," and payments to physicians compared to revenue creates "elevated risks relating to pay-to-play and anti-kickback laws."

7.    Following issuance of the report, the Company's share price declined $6.17 per share, or approximately 22%, to $21.36 per share on December 18, 2018. The Company's stock price continued to decline over the following three trading days, falling $1.53 on December 19, 2018, $1.94 on December 20, 2018, and $0.80 on December 21, 2018, to close at $17.09 per share on December 21, 2018.

8.    As detailed herein and in the federal securities class actions pending in this district styled *Police and Fire Retirement System of the City of Detroit v. AxoGen, et al.,* Case 8:19-cv-00069-EAQK-AAS, the officers and directors greatly damaged AxoGen by causing it to file false and misleading statements that omitted to reveal material adverse facts. Throughout the relevant period, those defendants caused harm to the Company by compelling it to issue statements that failed to disclose to investors: (1) that the Company aggressively increased prices to mask lower sales; (2) that the Company's pricing alienated customers and threatened the Company's future growth; (3) that ambulatory surgery centers form a significant part of the market for the Company's products; (4) that such centers were especially sensitive to price increases; (5) that the Company was dependent on a small number of surgeons whom the Company paid to generate sales; (6) that the Company's consignment model for inventory was reasonably likely to lead to channel stuffing; (7) that the Company offered purchase incentives to sales representatives to encourage channel stuffing; (8) that the Company's sales representatives were encouraged to

backdate revenue to artificially inflate metrics; (9) that the Company lacked adequate internal controls to prevent such channel stuffing and backdating of revenue; (10) that the Company's key operating metrics, such as number of active accounts, were overstated; and (11) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. §1331 and Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) of the Exchange Act and SEC Rule and 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

10.      This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual with sufficient contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) AxoGen maintains its principal place of business in this District; (ii) one or more of the Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AxoGen, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Harvey Jackson is, and has continuously been, a stockholder of AxoGen since the time of the wrongdoing complained of herein. Plaintiff is a citizen of New Jersey.

**Nominal Defendant**

13.     Nominal Defendant AxoGen is incorporated in Minnesota and has its principal executive offices located in Alachua, Florida. AxoGen's common stock is traded on the NASDAQ under the ticker symbol "AXGN".  AxoGen engages in the development and market of surgical solutions for peripheral nerves. It also provides products and education to improve surgical treatment algorithms for peripheral nerve damage or discontinuity. Its products include avance nerve graft, axoguard nerve connector, axoguard nerve protector, avive soft tissue membrane, acroval neurosensory and motor testing system, and axotouch two-point discriminator.

**Director Defendants**

14.     Defendant Karen Zaderej ("Zaderej") was, at all relevant times, the Company's Chief Executive Officer and a member of the Company's Board of Directors (the "Board") since 2011. She became Chairman of the Board in May 2018.  Zaderej joined AxoGen in 2006 as Vice President of Marketing and Sales, then served as Chief Operating Officer from October 2007 to May 2010, when she was appointed as CEO and became a member of the Board. Zaderej's total estimated compensation for the relevant time period was approximately $5,062,442, including *pro rata* portions of her annual compensation of $3,704,972 for 2017, and $3,665,188 for 2018. This compensation included a substantial equity-based component. Zaderej signed the October 2017 Registration Statement and the May 2018 Registration Statement, and certified AxoGen's 2016 10-K and 2017 10-K.

15.     Defendant Peter J. Mariani ("Mariani") has been the Chief Financial Officer of the

Company since March 2016. Mariani's total estimated compensation for the relevant time period was $2,071,565, including *pro rata* portions of his annual compensation of $1,656,151 for 2017, and $1,439,007 for 2018. Mariani signed the November 2017 and May 2018 Registration Statements, and signed and certified AxoGen's 2016 10-K and 2017 10-K.

16.     Defendant Gregory G. Freitag ("Freitag") is AxoGen's general counsel and a member of its Board of Directors since September 2011, Senior Vice President Business Development since May 2014, and was Chief Financial Officer from September 2011 to May 2014 and August 2015 to March 2016. He signed or authorized the signing of the Company's Registration Statements.

17.     Defendant Jamie M. Grooms ("Grooms") is a director of the Company since 2011. He signed or authorized the signing of the Company's Registration Statements filed with the SEC.

18.     Defendant Robert J. Rudelius ("Rudelius") is a director of the Company since 2010 and signed or authorized the signing of the Company's Registration Statements filed with the SEC.

19.     Defendant Mark Gold M.D. ("Gold") is a director of the Company since 2007 and signed or authorized the signing of the Company's Registration Statements filed with the SEC.

20.     Defendant Guido Neels ("Neels") is a director of the Company since 2015 and signed or authorized the signing of the Company's Registration Statements filed with the SEC. He has been an operating partner of EW Healthcare Partners L.P. (EW), since February 2013. EW sold 1.15 million shares in the November 2017 Offering.

21.     Defendant Amy Wendell ("Wendell") is a director of the Company since 2016 and was appointed Lead Independent Director in May 2018. She signed or authorized the signing of the Company's Registration Statements.

22.     Defendant Quentin S. Blackford has been a member of the Board since May 2019.

23.     Defendant Alan M. Levine has served as a member of the Board since May 2019.

24.     The defendants Rudelius, Freitag, Zaderej, Grooms, Gold, Wendell, Neels, Blackford, and Levine above are collectively referred to herein as the "Director Defendants."

25.     Defendant Mariani is herein referred to as the "Executive Defendant".

26.     The Director Defendants and the Executive Defendant are collectively referred to as the "Individual Defendants" where it is appropriate to do so.

## DUTIES OF THE DIRECTOR DEFENDANTS

**Fiduciary Duties**

27.     By reason of their positions as officers and directors of the Company, each of the Director Defendants owed and continues to owe AxoGen and its stockholders' fiduciary obligations of trust, loyalty, good faith, and due care, and was/is required to use his utmost ability to control and manage AxoGen in a fair, just, honest, and equitable manner. The Director Defendants were/are required to act in furtherance of the best interests of AxoGen and its stockholders, to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

28.     Each director of the Company owed and continues to owe AxoGen, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

29.     The Director Defendants, because of their positions of control and authority as directors and/or officers of AxoGen, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with AxoGen, each of the Director Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held

company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

30.     To discharge their duties, the directors of AxoGen were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Director Defendants were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)     remain informed as to how AxoGen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Conduct**

31.     The Director Defendants, as officers and/or directors of AxoGen, were also bound by the Company's Code of Conduct[1] (the "Code of Conduct"), which "sets out basic principles to guide all employees and officers of AxoGen." In particular, the Code of Conduct mandates that "all of the Company's books, records, accounts and financial statements, must be maintained in reasonable detail, must appropriately reflect the Company's transactions, must be promptly

---

[1] See AxoGen Code of Conduct:
https://d1io3yog0oux5.cloudfront.net/_671e995ceee3caef9e4ec73d859cb77c/AxoGeninc/media/a2ed313c73be1945214340879861b47c.pdf

disclosed in accordance with any applicable laws or regulations and must conform both to applicable legal requirements and the Company's system of internal controls."

32.     The Code of Conduct also provides "As a public company, it is necessary that the Company's filings with the United States Securities and Exchange Commission be accurate and timely. The Company expects employees and officers to take this responsibility very seriously and provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements. The Company's policy is to comply with all financial reporting and accounting regulations applicable to the Company. If any employee, director, or officer has concerns or complaints regarding accounting or auditing matters of the Company, then he or she is encouraged to submit those concerns…"

33.     Further, the Code of Conduct requires, in part, the following:

> Employees and officers are responsible for understanding the legal and policy requirements that apply to their jobs and reporting any suspected violations of the applicable laws of this Code or Company policy.

34.     In addition to these duties, Board members who served on the Audit Committee owed specific duties to AxoGen under the Amended and Restated Audit Committee Charter (the "Audit Charter").[2]  Specifically, they are mandated to:

> Provide oversight in relation to the financial reports, financial statements and other financial information communicated outside of the Company; the Company's system of internal controls; and the Company's auditing, accounting and financial reporting processes, including to: 1. Serve as an independent and objective party to oversee the Company's financial reporting process and internal control systems; 2. Review and appraise the audit of the Company's financial statements performed by the Company's independent registered accounting firm, who shall report directly to the Committee; and 3. Provide an open avenue of communication among the Company's independent registered accounting firm, internal audit, financial and senior management, and the Board.

---

[2] *See* Audit Committee Charter at:
https://d1io3yog0oux5.cloudfront.net/_7ab8a5deb443fd21be65a93d058d3013/AxoGeninc/db/351/8371/file/Charter+of+the+Audit+Committee+Rev.+5-6-19.pdf

35.     The Audit Charter further requires the Audit Committee to oversee internal controls and risk management, including:

> Provide risk oversight in conjunction and consultation with the Governance and Nominating Committee; Inquire of management, the Company's independent registered accounting firm, and the Company's internal audit firm about significant risks or exposures, and assess the steps management has taken to minimize such risk to the Company; Oversee the assessment and effectiveness of the Company's internal control environment, oversee the internal audit function, and discuss any significant deficiencies in internal controls identified with management, including the potential impact to the Company's ability to accurately record, process, summarize or disclose accurate financial statements; Review the following items with management and the independent registered accounting firm at the completion of the annual examination, and recommend to the Board whether the financial statements should be included in the annual report on Form 10-K: a. the Company's annual financial statements and related footnotes; b. the independent register accounting firm's audit of the financial statements and report thereof; c. any significant changes required in the audit plan; d. any serious difficulties or disputes with management encountered during the course of the audit; and e. any other matters related to the conduct of the audit which are to be communicated to the Committee under applicable audit standards.

**Breaches of Duties**

36.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of AxoGen, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

37.     The Director Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to revenue recognition practices. The Director Defendants also breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused AxoGen to incur substantial

damage.

38.     The Audit Committee members had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee AxoGen's public statements and internal control function.

39.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of AxoGen, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the securities class action that alleges violations of federal securities laws. As a result, AxoGen has expended, and will continue to expend, significant sums of money.

## THE INDIVIDUAL DEFENDANTS' CAUSED HARM TO THE COMPANY

40.     On August 2, 2017 AxoGen lodged its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017 (the "2Q17 10- Q") wherein it reported profits of $15.17 million and net loss amounting to $2.206 million.

41.     In relation to active accounts and their role in revenue growth, the 2Q17 10-Q stated:

> We have experienced that surgeons initially are cautious adopters for nerve repair products. Surgeons typically start with a few cases and then wait and review the results of these initial cases which can take from six to twelve months, or longer. Active accounts are usually past their initial wait period and have developed some level of product reorder. These active accounts have typically gone through their buying committee approval process, have at least one surgeon who has converted a portion of his or her treatment algorithms of nerve repair so as to use at least one of AxoGen's products and have ordered such product(s) at least six times within the last twelve months prior to the review date. The number of active accounts at the end of the second quarter of 2017 were

approximately 510, representing an increase of 36% compared to the second quarter of 2016.

As such, revenue growth is primarily due to increased purchases from active accounts, followed by revenue growth from new accounts. Each new period of measurement is thus benefited from growth in active accounts which may include those that were new accounts in the prior measurement period. We have continued to broaden our sales and marketing focus which we expect to have a continuing positive contribution to our revenue growth in the long term.

42.      In relation to controls and procedures, the 2Q17 10-Q said AxoGen had made amendments to its internal procedures to address material weaknesses regarding quarterly cycle count related to consigned inventories, which had been identified in the Company's annual report for the period ended December 31, 2016:

During the three months ended June 30, 2017, the Company made the following changes to the design of its internal controls over financial reporting:

- Improved procedures to test, evaluate and document the assumptions utilized in significant estimates; and

- Enhanced the scope and procedures of the testing an documentation of quarterly cycle counts of consignment inventory.

We believe these changes in internal controls over financial reporting address the material weaknesses relating to the design and operation of key controls around the use of judgment and calculations of significant estimates, as well as quarterly cycle count procedures related to consigned inventories, described in our 2016 Annual Report. Although these changes have been made, the material weaknesses or deficiencies will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. Weaknesses or deficiencies in our internal control over financial reporting may be identified when we assess the effectiveness of the Company's internal control over financial reporting as of December 31, 2017, or during the audit by our independent registered public accounting firm of the Company's internal control over financial reporting as of December 31, 2017.

43.      On November 1, 2017, the Company filed its quarterly report on Form 10-Q with the SEC for the period finishing September 30, 2017. In that report, AxoGen said it had revenue of $16.05 million and a net loss of $2.15 million, with 563 active accounts.

44.     On November 20, 2017, AxoGen's November Offering closed. In relation to the

price of its products, the November 2017 Registration Statement stated:

> AxoGen's operating results will be harmed if it is unable to effectively manage
> and sustain its future growth or scale its operations.
>
> There can be no assurance that AxoGen will be able to manage its future growth
> efficiently or profitably. Its business is unproven on a large scale and actual
> revenue and operating margins, or revenue and margin growth, may be less than
> expected. If AxoGen is unable to scale its production capabilities efficiently or
> maintain pricing without significant discounting, it may fail to achieve expected
> operating margins, which would have a material and adverse effect on its
> operating results. Growth may also stress AxoGen's ability to adequately
> manage its operations, quality of products, safety and regulatory compliance. If
> growth significantly decreases it will negatively impact AxoGen's cash reserves,
> and it may be required to obtain additional financing, which may increase
> indebtedness or result in dilution to shareholders. Further, there can be no
> assurance that AxoGen would be able to obtain additional financing on
> acceptable terms if all at.

45.     In relation to AxoGen's clients' dependence on reimbursements, the November

2017 Registration Statement said:

> AxoGen's revenues depend upon prompt and adequate reimbursement from
> public and private insurers and national health systems.
>
> Political, economic and regulatory influences are subjecting the healthcare
> industry in the U.S. to fundamental change. The ability of hospitals to pay fees
> for AxoGen's products depends in part on the extent to which reimbursement
> for the costs of such materials and related treatments will continue to be
> available from governmental health administration authorities, private health
> coverage insurers and other organizations. Major third party payers of hospital
> services and hospital outpatient services, including Medicare, Medicaid and
> private healthcare insurers, annually revise their payment methodologies which
> can result in stricter standards for reimbursement of hospital and/or surgeon
> charges for certain medical procedures or the elimination of reimbursement.
> Further, Medicare, Medicaid and private healthcare insurer cutbacks could
> create downward price pressure on AxoGen's products.

46.     On February 28, 2018, the Individual Defendants caused AxoGen to lodge its

annual report on Form 10-K with the SEC for the period finishing December 31, 2017 (the "2017

10-K"). In that report, AxoGen reported profits of $60.43 million, and a net loss of $10.45 million, with 591 active accounts.

47.     In relation to controls and procedures, the 2017 10-K said that management had effectively fixed previously-reported material weaknesses:

> As a result of [an] evaluation, management determined the Company had effectively remediated the material weaknesses in its internal controls that existed as of December 31, 2016 relating to the design and operation of key controls around the use of judgment and calculations of significant estimates, as well as quarterly cycle count procedures related to consigned inventories, and that as of December 31, 2017, our internal control over financial reporting was effective.

48.     On March 29, 2018, the Director Defendants Zaderej, Freitag, Grooms, Gold, Neels, Rudelius and Wendell caused the Company to file its 2018 Proxy Statement with the SEC pursuant to Section 14(a) of the Exchange Act seeking their respective elections as directors for one-year terms. The 2018 Proxy Statement, however, contained material misstatements and omissions.[3]

49.     The 2018 Proxy Statement contained the following concerning the Company's Code of Business Conduct and Ethics:

> We have adopted a Code of Business Conduct and Ethics that applies to our employees (including our principal executive officer, chief financial officer and other members of our finance and administration department) and our directors. Our Code of Business Conduct and Ethics is posted on our website at http://ir.AxoGeninc.com/governance-docs. In addition, we intend to post on our website all disclosures that are required by law or Nasdaq Stock Market listing standards concerning any amendments to, or waivers from, any provision of our

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about these allegations and related claims.

50. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public, and failed to comply with laws and regulations, or conduct business in an honest and ethical manner.

51. The Director Defendants also caused the 2018 Proxy Statement to be false and misleading regarding executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

52. On April 30, 2018, the Company lodged its quarterly report on Form 10-Q for the period finishing March 31, 2018. In this report, AxoGen reported revenue of $17.26 million, net loss of $5.64 million, and 604 active accounts.

53. On May 11, 2018, AxoGen's May Offering closed. In relation to the price of its products and reimbursement, the May 2018 Registration Statement repeated the statements identified in respect of the November 2017 Registration Statement above. It further stated reimbursement coding and coverage for nerve repair and grafting approved by regulatory authorities and that "[m]edicare reimbursement for hospital in- patient ranges from approximately $11,514 - $22,948."

54. On August 1, 2018, the Company lodged its quarterly report on Form 10-Q for the period finishing June 30, 2017. In this report, AxoGen reported profits of $20.58 million, net losses of $7.43 million, with 634 active accounts.

55. On October 29, 2018, the Company lodged its quarterly report on Form 10-Q for the period finishing September 30, 2018. In this report, AxoGen stated revenue of $22.66 million, net loss of $4.10 million, with 679 active accounts.

56.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about AxoGen's business, operations, and prospects.  The Individual Defendants caused the Company to mislead its investors, specifically: (1) that the Company aggressively increased prices to mask lower sales; (2) that the Company's pricing alienated customers and threatened the Company's future growth; (3) that ambulatory surgery centers form a significant part of the market for the Company's products; (4) that such centers were especially sensitive to price increases; (5) that the Company was dependent on a small number of surgeons whom the Company paid to generate sales; (6) that the Company's consignment model for inventory was reasonably likely to lead to channel stuffing; (7) that the Company offered purchase incentives to sales representatives to encourage channel stuffing; (8) that the Company's sales representatives were encouraged to backdate revenue to artificially inflate metrics; (9) that the Company lacked adequate internal controls to prevent such channel stuffing and backdating of revenue; (10) that the Company's key operating metrics, such as number of active accounts, were overstated; and (11) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

57.     On December 18, 2018, *Seligman Investments* issued a report ("the Seligman Report") which said that former employees alleged channel stuffing and backdating of revenue, that the number of active accounts may be overstated by a factor of ten, that "new customer acquisition is falling," that AxoGen's "growth has driven by unsustainable, aggressive price increases," and that the payments to physicians relative to revenue creates "elevated risks relating to pay-to-play and anti-kickback laws."

58.     The report said AxoGen representatives had indicated routine price increases by as much as 20%, a practice that alienated hospitals and surgeons, leading them to seek AxoGen's competitors:

> "We've been removed from accounts after price increases and then negotiated our way back in. **AxoGen is not a friend at the largest institutions. There is disdain toward the company.** Most institutions have issues with consistent high price increases and the lack of contract incentives. AxoGen rarely writes contract over one year. They won't guarantee pricing. **Hospitals and IDN's have taken notice.** Hospitals are used to 50% discounts and when they get only a 5-15% discount for significant volume, they're taken aback relative to other medical markets. **Sensitivity to AxoGen's price increases is now higher. Negotiations are getting more intense every year.** Price increases will have to get close to 3-4%/year vs. double digit every year. The annual price increase over the product line is 10-15% every March." – Former sales manager

> "I worked with [a large hospital system] to try and get a contract and they wouldn't finalize it. **AxoGen's new price increase may lead [them] to say remove your protectors and connectors. Some of my surgeons have moved over to Integra recently**. I have a hard time with AxoGen's board and decision making." – Former independent distributor

59.     The Seligman Report further stated that aggressive price increases especially affected the Company's relationship with a key sector of the market—ambulatory surgery centers, which depend on reimbursements to cover costs:

> Price sensitivity in the ambulatory surgery center ("ASC") channel poses a critical threat to AxoGen's business. ASC's are non-hospital outpatient surgery centers, which comprise a large and growing share of procedure volumes in AXGN's core market. Surgeons often own these facilities and have a vested interest in diverting volumes away from hospitals. Former AXGN employees as well as surgeons indicate that AxoGen is shut out of this market due to aggressive pricing and lack of reimbursement, and is therefore dependent on a small number of level 1 trauma centers – typically academic centers willing to eat the cost of AXGN's product themselves.

> • Former sales reps and other ex-employees we spoke to universally pointed to lack of acceptance by ASC's as a significant vulnerability in AXGN's business, with ASC's owning 40-65% or more of the procedure volumes in territories we queried.

> ***"It's much more difficult to be doing AxoGen in ASC's. AxoGen is priced out.***

*Doctors like to do fingers at ASC's.They can do more cases per day and they own the center. Even if you say use AxoGen for two cases per month, **the business manager will say you can't use it**. Occasionally you can get workers comp. **In my territory, easily 65% of hand surgeries were done in ASC's**."* – Former sales rep

**"AxoGen has a very concentrated customer base in trauma centers. The business may move to surgery centers as doctors line their pockets**. *Then they can't get an Avance graft there because it's a premium product […] Surgery centers are different. They have a set fee, so they have to pay the bill [for AxoGen] from one charge. **They can't eat up $1,400 [procedure fee] with $10,000 of AxoGen products**." - Former independent distributor*

*"**A lot of hand surgery is done in outpatient clinics but they're not friendly to expensive implants**. Our cheapest product is $1500 and it's a hard sell in a surgery center. **Try telling a surgeon he has to schlep to a major hospital to get reimbursed. We were getting booted out of surgery centers all the time**. They'd say I'm only using it for the worst cases and at a hospital."* – Former employee

*"Axoguard products are not priced for private surgery centers, **which was the bulk in my state. They had no buy in. Doctors say that the cost of Axoguard is more than the cost of reimbursement for the procedure.** They only used us in the rarest of circumstances like workers comp."* – Former sales rep

*"An orthopedic hand surgeon can do 5-6 cases per day at a center. **Every year I was there AxoGen would say they'd get a code for ASC's. 40% of the market was surgery centers when I was there**. Surgery centers are the most sensitive about price. They stop doing it if you keep raising the price. **AxoGen has talked about reimbursement codes for years**."* – Former sales rep

*"On reimbursement, most patients are inpatients at trauma centers. The cost is part of the global payment, whether commercial or medicare, so **trauma facilities are the sweet spot for AxoGen. In an outpatient scenario, AxoGen's world changes. Docs are trying to move procedures to outpatient facilities**, to hospital owned surgery center or outpatient discharge. There are three types of care: in-*

*patient, with a global bundled payment; hospital outpatient or hospital owned ambulatory, where rates are higher than ambulatory but less than bundled; and then ASC's which have the lowest carrier reimbursement. They just get a procedure fee. **Very few ASC's have implant carve outs. AxoGen isn't usually available there**."* – Former sales manager

60.     The Seligman Report noted AxoGen was dependent on a minor number of high-volume surgeons that the Company remunerates to elicit sales, and engaged in channel-stuffing to

boost the appearance of its sales:

> **"I've called on [this academic center] for a number of years. [It] is one of AxoGen's largest accounts. They don't come right out and say we'll only use your product if you do a trial with us. They'll say, "If you want to do a lot of business, it's good to have our staff speaking about your product and doing research**. I suggest you have the company do more research with us." You find out that they do speaking and research for those companies where they do a lot of business. AxoGen used [this account] for studies. **We provided money for their programs. All this was viewed very favorably. AxoGen wouldn't get near as much business if they didn't give them this money."** – Former sales rep

> **"15-20% of AxoGen's revenue** is from centers doing the trial." – Former independent distributor

* * *

OpenPayments lists the top ten physicians receiving payments from AXGN, for the five years through 2017. The data indicates that these doctors received 44% of AXGN's total reported general payments of $1.6MM in 2017, indicating a high risk that AXGN's sales volumes may be concentrated at a relatively small number of surgeon groups. A former sales rep estimated that one of the surgeons in the list may be a $2MM "if not $3MM" account. Given that AXGN's LTM revenues are only $78MM, the risk of dependence on a small number of high volume surgeons who receive large payments from AXGN is self-evident.

* * *

Former sales reps state either indirectly or bluntly that the company has engaged in channel stuffing. AxoGen uses a consignment model where company-owned inventory of nerves is stored in fridges at medical facilities. The company offers incentives to reps and customers for one-time, bulk purchases of the inventory on site, creating obvious potential for abuse ahead of quarters. We note the potential for control issues, as each fridge has to be checked at regular intervals to determine usage and billing for each period.

> **"I'm sure some channel stuffing went on."** – Former sales rep

> **"A lot of channel stuffing is happening."** – Former sales rep

"I did a lot of consignment. Property is retained by AxoGen but is stored by the facility. AxoGen has incentives for direct reps to convert accounts to owned where hospitals purchase the inventory. **The company incentivizes accounts for bulk purchase**.

With heavy price increases, the consignment list price is 15-20% more expensive

if it's consigned vs. owned by the facility. **Reps try to convert consignment to purchase inventory. […] This happens mostly in March with the annual price increase. AxoGen has been doing bulk purchase incentives aggressively for 3-4 years."** - Former sales manager

"I used to consign and consign. We switched because consignment was costing a fortune because reps puts tons of inventory at the facility. The company asked us to convert to purchase, and set a higher price for consignment. **They would offer a one time incentive to buy $50k plus of inventory."** – Former sales rep

"A lot of hardware [nerve grafts] is on loan or consignment. Customers agree to take proper care of it. AxoGen supplies x amount of inventory. **It's pay as you go. Reps are responsible for checking inventory or billing. […] You'd see spikes in revenue when reps sell the inventory."** – Former sales manager

61.     The Seligman Report explained that it was AxoGen's standard practice for employees to backdate revenue, and that operating accounts were significantly overstated, to make the Company appear as if it were expanding, when in facts sales were not growing.

**"The only shady thing is the close of months. AxoGen extends the close of the month. They count contracts that went out after the end of the month. Previously end of the month was a relative term [laughing].** Any product delivered for surgery but not invoiced at the end of the month had a stub period to count it in the previous month. **They tried stopping that […] I'm not sure how successful that was.** It's usually 7-10 days into the following month." – Former sales manager

"If I did a case on consignment or shipped for a big case and a train wreck came, and the hospital said ship us seven each of these sizes, we'd bill for whatever they use and ship the rest back. **We had 7 days for purchase orders for procedures into the last month. A lot of channel stuffing is happening. Every month I had one week to shore up purchase orders from the previous month. Seven business days. So if its seven days after Labor Day, I would have had until Sep 13th to clean up August. Always within a day or two, you could sneak a case one way or the other.** Just shipping some of September sales back into August. Or hold the purchase order for September vs. August." – Former sales rep

\* \* \*

However, a former sales rep in a key metropolitan area indicated a potential 10:1 reduction in the number of actual accounts, as in his territory "30 active accounts" were comprised by just 3-5 hospital systems. The rep stated that contracts were at the IDN level, yet the company counted individual sites within

the same IDN as separate accounts. (IDN's are "Integrated Delivery Networks" . . .)

"I had 30 active accounts that ordered regularly or fairly regularly. 5-10 were sporadic. We didn't define what was active. An account is an individual hospital. [A large IDN, name redacted] was 8 hospitals. **There were 3-5 IDN's in my market. All major. They comprised almost all of my 30 active accounts. […] If I collapsed AxoGen's 5-600 accounts like in my territory, [the reduction from accounts to IDN's] would be similar. Even though we have IDN-level agreements, each hospital was its own decision-maker."** – Former sales rep

• Other former employees pointed to questionable practices around other metrics, particularly around the lack of "same-store" sales growth.

**"Growth wasn't coming from repeat sales**. It came from expansion like picking up another hospital. The company was spending more than $1 to get $1 of sales. **Sales weren't growing organically** […] We wanted to mask it. Most of the growth was coming from adding new territories and reps." – Former employee

***"After 10,000 patients, the company stopped reporting on these numbers publicly."*** *– Former employee*

62.     Following these revelations, AxoGen's share price fell $6.17 per share, or about 22%, to close at $21.36 per share on December 18, 2018, on extraordinarily high trading volume. The share price continued to decline over the next three trading sessions, dropping $1.53 on December 19, 2018, $1.94 on December 20, 2018, and $0.80 on December 21, 2018, to close at $17.09 per share on December 21, 2018.

## DAMAGES TO AXOGEN

63.     The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

(a)  Restatements and goodwill impairments;

(b)  Liability arising from securities fraud litigation;

(c)  The loss of credibility with customers and suppliers; and

(d)  Legal and accounting costs associated with litigation, investigations and restatements.

## DERIVATIVE ALLEGATIONS

64.     Plaintiff brings this action derivatively and for the benefit of AxoGen to redress injuries suffered, and to be suffered, because of the Director Defendants' breaches of their fiduciary duties as directors and/or officers of AxoGen, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

65.     AxoGen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

66.     Plaintiff is, and has been continuously at all relevant times, a stockholder of AxoGen. Plaintiff will adequately and fairly represent the interests of AxoGen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

67.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

68.     A pre-suit demand on the Board of AxoGen would have been futile and, therefore, is excused.  At the time of filing of this action, the Board consists of Director Defendants Zaderej, Wendell, Freitag, Gold, Grooms, Blackford, Levine, Neels and Rudelius.  Plaintiff need only allege demand futility as to a majority of Director Directors who were on the Board at the time this action was commenced.

69.     Demand is excused here because of the nine Director Defendants, seven, individually and collectively, face a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.  Indeed, Director Defendants Zaderej, Wendell, Freitag, Gold, Grooms, Neels, and Rudelius signed the false and misleading Registration Statements for the offerings. They also solicited the false and misleading 2018 Proxy.

70.     Demand is further excused as against of Defendant Zaderej because on November 13, 2018, Zaderej sold 13,000 shares at an average price of $33.42, garnering proceeds of $434,460. Then, the very next day, she sold an additional 12,000 shares at an average price of $32.93, bringing in an additional $395,160, for ***total proceeds of $829,620***. On information and belief, these sales were not conducted pursuant to Rule 10b5-1 trading plans.

71.     Demand is further excused as against Defendant Neels.  Since 2013, Neels has been the operating partner of EW Healthcare Partners, L.P an AxoGen shareholder that sold 1.15 million shares in the November 2017 Offering.  Defendant Neels is incapable of objectively considering a demand that might implicate EW in the sale of the shares at inflated prices pursuant to false and misleading offering materials.

72.     In complete abdication of their fiduciary duties, the Direct Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, inter alia, intended to make the Company appear more profitable and attractive to investors. Because of the foregoing, the Director Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Audit Committee**

73.     Demand is otherwise futile with respect to the four members of the Audit Committee (Gold, Rudelius, Blackford and Levine) because they face the risk of substantial

liability stemming from their failure to oversee the Company's compliance with applicable accounting regulations despite their mandate to do so under the Audit Committee Charter.

**Additional Considerations**
**Non-Compliance with the Code of Conduct**

74.     In violation of the Code of Conduct, the Director Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in an accounting scheme to issue materially false and misleading statements to the public and facilitate and disguise the Director Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

75.     AxoGen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AxoGen any part of the damages AxoGen suffered and will continue to suffer. Thus, any demand upon the Directors would be futile. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Directors can claim exculpation from their violations of duty pursuant to the Company's charter.  As a majority of the Directors face a substantial likelihood of liability, they are self- interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as futile.

76.     The acts complained of herein constitute violations of fiduciary duties owed by

AxoGen's Director Defendants, and these acts are incapable of ratification.

**Insurance Considerations**

77.     The Director Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AxoGen. If there is a directors and officers' liability insurance policy covering the, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of AxoGen, there would be no directors and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

78.     If there is no directors and officers' liability insurance, then the Director Defendants will not cause AxoGen to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

79.     Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Director Defendants**
*for Violations of Section 14(a) of the Exchange Act*

80.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

81.　　The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

82.　　Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

83.　　Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

84.　　Under the direction and watch of the Director Defendants, the 2018 Proxy Statement failed to disclose material adverse facts about AxoGen's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company aggressively increased prices to mask lower sales; (2) that the Company's pricing alienated customers and threatened the Company's future growth; (3) that

ambulatory surgery centers form a significant part of the market for the Company's products; (4) that such centers were especially sensitive to price increases; (5) that the Company was dependent on a small number of surgeons whom the Company paid to generate sales; (6) that the Company's consignment model for inventory was reasonably likely to lead to channel stuffing; (7) that the Company offered purchase incentives to sales representatives to encourage channel stuffing; (8) that the Company's sales representatives were encouraged to backdate revenue to artificially inflate metrics; (9) that the Company lacked adequate internal controls to prevent such channel stuffing and backdating of revenue; (10) that the Company's key operating metrics, such as number of active accounts, were overstated; and (11) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

85. The 2018 Proxy Statement also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct. The 2018 Proxy Statement was also false and misleading because, despite assertions to the contrary, AxoGen's Code of Conduct was not followed, as the Director Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

86. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2018 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

87.     The false and misleading elements of the 2018 Proxy Statement led to the re-elections of all of the Director Defendants which allowed them to continue breaching their fiduciary duties to AxoGen.

88.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

89.     Plaintiff on behalf of AxoGen has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

90.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

91.     The Individual Defendants, by virtue of their positions with AxoGen and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AxoGen and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause AxoGen to engage in the illegal conduct and practices complained of herein.

92.     Plaintiff on behalf of AxoGen has no adequate remedy at law.

## THIRD CLAIM
### Against Individual Defendants
*for Breach of Fiduciary Duties*

93.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

94.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AxoGen's business and affairs.

95.     Each of the Individual Defendants violated and breached their fiduciary duties of

candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

96.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AxoGen.

97.     In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

98.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

99.     Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose: (1) that the Company aggressively increased prices to mask lower sales; (2) that the Company's pricing alienated customers and threatened the Company's future growth; (3) that ambulatory surgery centers form a significant part of the market for the Company's products; (4) that such centers were especially sensitive to price increases; (5) that the Company was dependent on a small number of surgeons whom the Company paid to generate sales; (6) that the Company's consignment model for inventory was reasonably likely to lead to channel stuffing; (7) that the Company offered purchase incentives to sales representatives to encourage channel stuffing; (8) that the Company's sales representatives were encouraged to backdate revenue to artificially inflate metrics; (9) that the Company lacked adequate internal controls to prevent such channel stuffing and backdating of revenue; (10) that the Company's key operating metrics, such as number of active accounts, were overstated; and (11) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading

and/or lacked a reasonable basis.

100.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

101.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

102.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

103.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

104.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AxoGen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

105.     Plaintiff on behalf of AxoGen has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants**
*for Unjust Enrichment*

106.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

107.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AxoGen.

108.     The Individual Defendants either benefitted financially from the improper conduct or received unjust compensation tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from AxoGen that was tied to the performance or artificially inflated valuation of AxoGen, or received compensation that was unjust in light of the Director Defendants' bad faith conduct.

109.     Plaintiff, as a stockholder and a representative of AxoGen, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Director Defendants due to their wrongful conduct and breach of their fiduciary duties.

110.     Plaintiff on behalf of AxoGen has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants**
*for Waste of Corporate Assets*

111.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

112.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, engage in internal investigations, and lose financing from investors and business from future customers who no longer trust the Company and its products.

113.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

114.    Plaintiff on behalf of AxoGen has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Director Defendant as follows:

a.    Declaring that Plaintiff may maintain this action on behalf of AxoGen, and that Plaintiff is an adequate representative of the Company;

b.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AxoGen;

c.    Determining and awarding to AxoGen the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

d.    Directing AxoGen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect AxoGen and its stockholders from a repeat of the damaging events described

herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of AxoGen to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

e.    Awarding AxoGen restitution from Individual Defendants, and each of them;

f.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 8, 2019,                    CULLIN O'BRIEN LAW, P.A.
                                           CULLIN A. O'BRIEN
                                           Florida Bar No. 597341


                                           *s/Cullin O'Brien*
                                           CULLIN O'BRIEN

                                           6541 NE 21st Way
                                           Ft. Lauderdale, FL  33308
                                           Telephone:  561/676-6370
                                           561/320-0285 (fax)
                                           cullin@cullinobrienlaw.com

- 33 -

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171

*Attorney for Plaintiff Harvey Jackson*